IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROBERT ALBERT THOMPSON,<br><br>                Petitioner,<br><br>vs.<br><br>JOE LIZARRAGA, Warden, Mule Creek<br>State Prison,<br><br>                Respondent. | No. 2:15-cv-01347-JKS<br><br>MEMORANDUM DECISION |

Robert Albert Thompson, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Thompson is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Mule Creek State

Prison. Respondent has answered, and Thompson has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On February 17, 2012, Thompson was charged with the murder of Sharon ("Kitty")

King. The information also alleged that Thompson: 1) personally used a knife; 2) had suffered

one prior strike conviction and one prior serious felony conviction; and 3) had served one prior

prison term. Thompson pleaded not guilty, denied the enhancement allegations, and proceeded

to a jury trial. On direct appeal of his conviction, the California Court of Appeal laid out the

following facts underlying the charge against Thompson and the evidence presented at trial:

### A. Living Arrangements

[Thompson] lived with three women in an apartment on Bell Street. The group
had an amicable, polyamorous sexual relationship; [Thompson] was also openly involved
in a sexual relationship with a fourth woman who visited the apartment, and with the
victim as well, who lived in the Foothill Farms area west of Interstate 80.
Most of these women had nicknames, which we will employ. To the extent it is
relevant to the jury's assessment of their credibility, we note that "Lala" admitted she

was a prostitute and gave [Thompson] all of her earnings.  "Sena" bought items for the household, but did not otherwise provide [Thompson] with any money.  The third resident of the apartment—"Tia"—denied that she or Sena worked as prostitutes.  ([Thompson] testified that Sena worked as a prostitute at some point after moving into the apartment, but Tia did not.  "Karma"—the fourth woman—also agreed Tia did not work as a prostitute.)  Karma started working as a prostitute after meeting [Thompson].  [Thompson] had told Lala that victim Sharon King ("Kitty") was his sugar momma (indicating to Lala that Kitty provided money whenever he asked).  According to [Thompson] and Lala, Kitty never worked as a prostitute.

Lala testified that [Thompson] had been physically abusive with her, and had also threatened to kill her and dispose of her body where no one would be able to find it.  The four other women had seen [Thompson] argue with Kitty about her drinking; Kitty in return argued about [Thompson's] control of the use of her car.  Lala also saw [Thompson] beat Kitty before having sexual relations with her.  Text messages on [Thompson's] phone records indicated he and Kitty argued about his assertion of control over her money, and Kitty told him that she was going to leave him because he was verbally and physically abusive.  [Thompson] admitted arguing with Kitty about her use of drugs, but denied ever hitting her.

### B. The Night in Question

On February 13, 2012, [Thompson] dropped off Sena at her mother's house.  He asked to borrow a gas can—assertedly to fill one of the household's cars that had run empty—that he took with him.  Later that evening, [Thompson] drove with Lala in Kitty's car to a gas station, where he filled two or three gas cans and put them in a duffle bag.  He normally kept only one gas can in the trunk for when he would drive out of town.  He told Lala they would all be driving out of town and he did not want to stop.  After they got the gas, [Thompson] and Lala went back to Kitty's house.

The ensemble was gathered there.  Kitty was preparing food.  Later in the evening, [Thompson] announced to the five women that they were all going to go for a ride; Lala was under the impression they were going out to "work."  They used Kitty's car; Lala was the driver.  Before they left, [Thompson] gave Sena a list of text messages he wanted her to send to Kitty's phone.

The testimony about the events thereafter diverges in the particulars.  We do not need to detail the discrepancies, as these do not diminish the sufficiency of the evidence because it is for the jury to resolve which facts from which accounts to accept.  (*People v. Love* (1960) 185 Cal. App. 2d 604, 608; *People v. Holman* (1945) 72 Cal. App. 2d 75, 89–90.)

[Thompson] told Lala to drive to the downtown Sacramento parole office on North B Street near the Loaves and Fishes facility and park in the lot (where they had slept in their car frequently before).  [Thompson] got out of the car and said he would be right back.  Kitty also got out of the car.  He walked away with Kitty, after taking a plastic bag of clothing from Sena's lap that Kitty had packed and retrieving the duffle bag of gas cans from the trunk.  Before leaving with Kitty, he told Lala he had changed his mind about them working; he directed her to drive to a nearby location in front of an

apartment complex on Dos Rios Street near Richards Boulevard.  As they waited, Sena sent the text messages on [Thompson's] list to Kitty's phone, after which Sena burned the sheet of paper as [Thompson] had also directed.  At some point, [Thompson] called Sena and said he had taken care of a problem.  [Thompson] called Lala on her cell phone and told her to meet him where he was walking; she drove to a parking lot of a Midas shop near 16th and D Streets.

[Thompson] was alone.  According to Lala, he did not respond when asked about Kitty.  Tia could recall only that he said something about Kitty being gone and not wanting to talk about the subject further; she did not recall him saying that Kitty was dead.[FN1]  He was focused on the fact that the car battery was now dead, complaining that the women had run it down listening to the radio.  [Thompson] was barefoot, and was not carrying either of the bags that he had taken with him.  Karma thought he was wearing a different outfit.  [Thompson] told Lala to text Kitty and let her know about the car problem.  Everyone then slept in the car until the Midas shop opened, whose staff told them it would charge them for any assistance.  After having the car towed, the group returned to their own apartment.  When a TV news report mentioned police finding a body in Discovery Park set on fire, [Thompson] said, "[Y]ou see that."  He then told everyone that they were all taking a walk to meet someone for a ride.

> FN1.  However, Tia told a detective that [Thompson] had said Kitty was "gone" or "dead" and had also cautioned the women not to say anything about his returning to the car without Kitty.  As for Karma, she testified that on his return [Thompson] told them that Kitty had gotten angry and left, in a manner suggesting that this was an account with which they should agree.  He also had emphasized to her, in particular, the importance of being part of a team, and his need for her to be supportive of him; if interviewed, she should say that she had not been with him, and that Kitty was out of town.

Karma left.  The others got a ride from Sena's mother, where they had access to another car.  [Thompson] had Lala drive that car to Kitty's home, purportedly to pick her up.  As they approached the residence, they saw police outside.  [Thompson] told Lala to drive off; a short distance away, he told her to stop.  He hopped out of the car, saying that he needed to handle something, and ran off.  Lala drove to the freeway, at which point the police surrounded the car and detained the women for questioning.

### C. Kitty's Fate

A bicyclist riding to work in Natomas through Discovery Park at 3:30 a.m. on the morning of February 14 had observed through the fog a fire burning intensely in the distance as he crossed over the Jibboom Street Bridge.  Another bicyclist crossed over the bridge at 6:00 a.m. on his way to work at the state college.  A fire was burning vigorously to the north of the bicycle trail near the archery range.  He called 911.

Police and firefighters found what they determined to be the badly disfigured charred remains of a woman.  A black purse was nearby, which contained a driver's license belonging to the victim.  It was readily apparent that gasoline was involved in the

fire: The grass and leaves in the area were wet, yet the fire had burned down to the soil; there was a smell of gasoline in the area; and deep burn marks on the sides of the body were consistent with gasoline being poured on it. However, the pathologist determined that Kitty was "most likely" dead from a stab wound in the heart before the incineration of her body.

Police were in the process of searching Kitty's residence later that evening when they saw a car drive slowly up the alleyway toward her driveway. An officer who saw it recalled that it matched the description of a car associated with the victim. A neighbor shouted to the officer that this was a car of which he should take notice. The officer ran to his patrol car to follow. Losing sight of it, he broadcast a description. The police were able to detain it almost immediately on the freeway near Madison Avenue. Its three occupants were Lala, Sena, and Tia. They agreed to answer questions about Kitty (the police not letting them know at the time about finding the body).

### D. [Thompson's] Postarrest Behavior

In his interview with the police, [Thompson] claimed he had left Kitty's home on February 13 around 9:00 p.m. with the others, and had not seen Kitty since then. She was not with them when the car broke down. He suggested she had "snuck" to Fresno after being intimate with another man. [Thompson] said that he and the other women had driven to the home of Sena's mom in South Sacramento. He was passed out in the back of the car on their way home after drinking too much, and the women woke him up when the car broke down. He first went to try to get help from his brother, who lived near Del Paso Boulevard and Arden Way, but no one was home. He came back to the car, and they all slept until the Midas shop opened. He also claimed it was Lala who wanted to leave after seeing the police at Kitty's home; she drove off without him after he got out to have a cigarette. When the detective told him that Kitty was dead, he expressed his surprise, then asked to talk to his probation officer before answering any further questions. He did not complain of being in any pain, and a booking photograph of him without his shirt on did not show any apparent injuries.

There was documentation of about 30 visits and phone calls with [Thompson] while he was in jail awaiting trial. During one conversation, [Thompson] said he got out of the car before the women were detained in order to go to the bathroom, but during another he said it was his probationary status that had motivated him to flee the car. He told both Sena and Tia that they should stay with a friend of his in Fresno to avoid testifying. He also counseled both of them to refuse to testify if called to trial, even if this would result in being held in contempt. He explained to them the importance of everyone sticking to the same story, and asked Sena to bring a pencil and paper to hold up to the window so that they could achieve this end without talking over the jail phones. He also expressed his frustration with Sena "messing with" his case, and directed her to heed his instructions.

### E. [Thompson's] Account at Trial

[Thompson] had contacted his probation officer in late January 2012 about obtaining shorter or more favorable terms of probation in exchange for providing

information about large-scale narcotics operations to federal authorities. When everyone was at Kitty's on the night of February 13, he learned that she had arranged to meet a friend of his for a drug deal near Discovery Park in order to get extra money for them by transporting something out of town. He told Kitty about his negotiation with his probation officer, and suggested that he come along in order to gather information about his friend's operation that he could share with the probation officer as well. Kitty brought a bag of clothes because she intended to spend the night with defendant afterward.

When they parked the car, [Thompson] took a duffle bag out of the trunk that had his sweatshirt in it. Kitty took out her bag of clothes in order to put it in her backpack. After extracting his sweatshirt, [Thompson] threw his bag away when he found it had gotten some kind of fecal material on it from another bag. He initially confiscated Lala's and Sena's cell phones in case they were also involved in the drug deal, but then returned them. He and Kitty walked the two blocks up to Richards Boulevard, then headed down Richards past the freeway. They encountered the friend, who pointed a gun at [Thompson] and told them to follow him. They walked over a bridge into Discovery Park near the archery range. Two people joined them here, both of whom [Thompson] recognized.

[Thompson's] friend grabbed Kitty and jumped on top of her when she fell on her back. One of the other two men wrestled with [Thompson], injuring [Thompson's] wrist as he pinned [Thompson] to the ground on his stomach. The man released [Thompson]. The friend walked [Thompson] away from the area, telling him that he would take Kitty home and would clean up the scene. [Thompson] did not see Kitty move as he left. [Thompson] discarded his shoes after walking through some mud or manure. He did not tell the other women on his return what had happened to him in Discovery Park.

The manager of a downtown residential motel was a defense witness. He had been taking his morning walk through Old Sacramento at about 6:00 a.m. on February 14. He observed a man ranting angrily about killing someone and "his bitch." Having already heard about the Discovery Park incident, the manager took a picture of the angry man and gave it to the police.

[Thompson] identified the person in the manager's picture as his attacker. He had not said anything in his police interview about the attack because he was "preserving" that information to provide it to his probation officer for favorable treatment. He in fact had complained of the pain in his wrist during his interview, and his wrist was put in a cast while he was in jail.

*People v. Thompson*, No. C073272, 2-14 WL 2812879, at *1-4 (Cal. Ct. App. Jun. 23, 2014).

At the conclusion of trial, the jury found Thompson guilty of first-degree murder and also found true the personal use of a knife enhancement allegation. Thompson waived his right to a jury trial on the prior conviction and prior prison term enhancement allegations, and the court

subsequently found them both true. The court sentenced Thompson to an aggregate term of 57 years to life imprisonment.

Through counsel, Thompson appealed his conviction, arguing that: 1) his due process rights were violated when the trial court allowed the prosecution to impeach Thompson with two offenses that were not crimes of moral turpitude; and 2) the trial court abused its discretion and denied him due process and a fair trial when it admitted irrelevant and inflammatory photographs. The California Court of Appeal unanimously affirmed the judgment against Thompson in a reasoned, unpublished decision issued on June 23, 2014. Thompson filed a counseled petition for review in the California Supreme Court that raised both claims unsuccessfully raised to the Court of Appeal. The Supreme Court summarily denied review on August 27, 2014.

Proceeding *pro se*, Thompson then filed in the Superior Court a petition for habeas relief. In that petition, Thompson averred that: 1) the prosecution allowed investigating officers to commit obstruction of justice; 2) the prosecution withheld exculpatory evidence that proved someone took the keys to the victim's home and entered her house shortly after her murder; 3) the prosecution misled the jury with prejudicial accusations of Thompson's uncharged prior abuse against the victim; 4) the prosecution elicited the perjured testimony of certain witnesses and knowingly failed to disclose the arrest of one of its witnesses; 5) trial counsel was ineffective for failing to present to the jury a "confession letter" from the man that Thompson alleges was the true assailant; and 6) trial counsel failed to interview two key witnesses. The petition was denied in a reasoned, unpublished opinion issued on January 21, 2015.

Thompson raised the same claims in a *pro se* petition in the Court of Appeal, which additionally alleged that the superior court erred in denying his habeas petition filed in that court. The Court of Appeal denied the petition without comment on March 19, 2015. The California Supreme Court summarily denied an identical habeas petition on June 17, 2015.

Thompson then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on June 22, 2015. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Thompson argues that: 1) the trial court erred in allowing the prosecution to impeach Thompson with two prior convictions; 2) the trial court admitted irrelevant and inflammatory photos in violation of Thompson's right to a fair trial; 3) the prosecutor committed misconduct by allowing investigators to intimidate and discourage a potential defense witness; 4) the prosecution failed to disclose evidence that proved that the victim's keys were taken and used to enter her home after the murder; 5) the prosecution committed misconduct by asking the jury to ignore exculpatory evidence; 6) the prosecution elicited perjury to argue that Thompson had an abusive relationship with the victim; 7) the prosecution failed to disclose that one of its witnesses had been arrested; 8) trial counsel rendered ineffective assistance by failing to present the jury with a "confession letter" from the true assailant; and 9) trial counsel was ineffective for failing to interview two key witnesses.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A. **Evidentiary Errors (Grounds 1, 2)**

Thompson first claims that the trial court made two evidentiary errors. The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there

are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

    *i.*    *Prior convictions*

The Court of Appeal considered and rejected on direct appeal Thompson's challenge to the admission of his prior convictions as follows:

> After trial counsel indicated [Thompson] would be testifying, the prosecutor asserted her intent to impeach him with a number of prior convictions. Subject to any additional authority the parties might muster, the trial court ruled that the prosecutor could use four of the convictions for purposes of impeachment; at defense counsel's behest, the court directed the prosecutor to "sanitize" two of them (a 2007 conviction for sodomy while incarcerated, and a 2011 conviction for failure to register as a sex offender) by referring to them only as felonies "involving moral turpitude."
> At the outset of his direct examination of [Thompson], counsel preemptively raised the issue of the prior convictions. [Thompson] acknowledged he had a conviction in 1998 for selling drugs, in 2001 for robbery, and in 2007 and 2011 for felonies involving moral turpitude. The prosecutor nonetheless reiterated these points in her cross-examination of [Thompson] (managing to confuse the nature of the prior convictions).
> [Thompson] contends sodomy while incarcerated and failure to register as a sex offender are not crimes involving minimum statutory elements that reflect a "'readiness to do evil'" (either as a matter of demonstrating dishonesty or "moral depravity") as required in the definition of moral turpitude applying to impeachable felony convictions (which is based on the limitations of due process to relevant convictions). The People concede the point, but assert the error was not prejudicial. As we agree with the latter premise, because we do not find even the possibility of a more favorable outcome for [Thompson] if these additional convictions were not before the jury,[FN3] we do not express any opinion on the merits of [Thompson's] claim. (As a result, we do not need to consider his arguably "lurking" additional claim that the trial court erred in imposing the burden on him to find a basis for exclusion of the impeachment evidence).

FN3.   We consequently reject [Thompson's] assertion that any error must be harmless beyond a reasonable doubt.

[Thompson] properly notes that evidence may be excluded as cumulative. However, the admission of cumulative evidence is not generally prejudicial.  [Thompson] fails to show any exceptional circumstance in the present case that would take it outside this principle, particularly where this cumulative impeachment was in sanitized form. We thus reject the claim of prejudicial error.  We do not find persuasive [Thompson's] invocation of a decision of the late Justice Bernard Jefferson, who criticized the presumption that jurors heed admonitions (in the context of admission of other crimes evidence) as being "an exercise in futility and illusory imagery."   As noted in a later case, this rhetoric does not have any weight in the absence of affirmative evidence that a jury disregarded limiting instructions.

*Thompson*, 2014 WL 2812879, at *4-5.

Thompson fares no better on federal habeas review.[1]  First, to the extent that he argues that the admission of his prior convictions violated state law, again Thompson is not entitled to habeas relief.  *See Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle*, 502 U.S. at 67-68.

Moreover, Thompson cannot show that the trial court's ruling violated his constitutional rights.  Again, "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process."  *Holley*, 568 F.3d at 1101.  "Although the Court has been clear that a writ should issue when constitutional errors have rendered the trial fundamentally unfair [citation], it has not yet made a clear ruling that admission of irrelevant or

---

[1]      Because Thompson testified at trial and was impeached with his prior convictions, his challenge to the court's ruling on that issue is cognizable on federal habeas review.  *See Luce v. United States*, 469 U.S. 38, 48 (1984) (holding that, in order to present an objection to a trial court's ruling that a prior conviction could be admitted, a defendant must actually testify at trial); *Galindo v. Ylst*, 971 F.2d 1427, 1429 (9th Cir. 1992) (per curium) (applying *Luce* in the context of a habeas petition).

overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Similarly, to the extent Thompson argues that the prior convictions inflamed the jury by suggesting Thompson's propensity to commit the present crime, the United States Supreme Court has never held clearly that the introduction of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to propensity evidence, where petitioner could point to no Supreme Court precedent establishing that admission of otherwise relevant propensity evidence violated the Constitution).

In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted). Because the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court, Thompson's challenge to the admission of his prior convictions also must fail.

ii.     *Photographic evidence*

Thompson also argues, as he did on direct appeal, that the trial court erred in admitting several autopsy photographs, his booking photograph, and two screenshots from his social media account. Thompson avers that the photographs are either irrelevant or unnecessary, or more prejudicial than probative.

A due process claim can be stated where graphic photos of victims make the trial fundamentally unfair. *Jammal*, 926 F.2d at 919. However, photos that are relevant to the criminal charges and elements thereof are admissible. *See Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996). Under California law, "photographs which disclose the manner in which the victim was wounded are relevant on the issues of malice and aggravation of the crime and the penalty." *People v. Thompson*, 785 P.2d 857 (Cal. 1990) (citation and internal quotation marks omitted). Moreover, reversal will not occur unless the trial is rendered fundamentally unfair by the introduction of the photographs. *Batchelor v. Cupp*, 693 F.2d 859 (9th Cir. 1982). Admission rests largely in the discretion of the trial court. *Id.*

In this case, the Court cannot say that the introduction of the autopsy photographs so infected the trial with unfairness as to render the verdict a denial of due process. The California Court of Appeal considered the photographs and held that there was no reasonable possibility that excluding the two photos of the burned remains of the victim would have resulted in a more favorable outcome for Thompson and that the remaining autopsy photographs illustrated the pathologist's testimony on the cause of death and thus the trial court did not abuse its discretion in concluding that any prejudice from those photographs did not outweigh their probative value. *Thompson*, 2014 WL 2812879, at *4. The factual findings of the state court are presumed

correct. 28 U.S.C. § 2254(e)(1). Thompson has failed to meet his burden of proving that the state court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Thompson also challenges as unduly prejudicial the admission of his booking photograph and photographs from his social media account. However, the Court concurs with the trial court and the Court of Appeal that the booking photograph, which shows Thompson's tattooed torso, was relevant on the issue of Thompson's veracity to the extent it contradicted his claim of being wrestled to the ground. Since the booking photograph was thus relevant to an issue in the case, its admission cannot be said to have violated due process. *See Estelle*, 502 U.S. at 70; *Jammal*, 926 F.2d at 920 ("Only if there are no permissible inferences the jury can draw from the evidence can its admission violate due process.").

With respect to the social media account photos, which Thompson avers were introduced solely to portray him as a "gang banger," the Court of Appeal conceded that the admission of those photos "was arguably an abuse of discretion." *Thompson*, 2014 WL 2812879, at *6. But even assuming, without deciding, that the photographs were "inflammatory" and unduly prejudicial as Thompson contends, habeas relief still would not be warranted under the AEDPA because, again, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *See Holley*, 568 F.3d at 1101. Absent such "clearly established Federal law," the Court is unable to find or conclude that the state courts' rejection of Thompson's evidentiary

error claim was either contrary to or involved an unreasonable application of clearly established Supreme Court law.  *See id.*; *see also Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.").  Accordingly, the Court must conclude that the state courts' rejection of Thompson's evidentiary error claims was neither contrary to nor involved an unreasonable application of clearly established Supreme Court law.

**B.      Prosecutorial Misconduct (Grounds 3-7)**

Thompson next alleges that the prosecutor committed misconduct in a number of ways.

*i.      Obstruction of justice/intimidation of potential defense witness*

Thompson first argues that the prosecutor committed misconduct by allowing the investigating officers to go to potential defense witness Andrea Odom's home and advise her not to testify on Thompson's behalf at his trial.

The Ninth Circuit recently reiterated that it "ha[s] repeatedly held that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'"  *Earp v. Davis*, 881 F.3d 1135, 1145 (9th Cir. 2018) (quoting *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998)).  In addition to proving that the prosecutor engaged in witness intimidation by a preponderance of the evidence, a state prisoner seeking habeas relief must also prove that he was prejudiced by that intimidation.  *Id.*; *see also Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2000) ("Our finding of constitutional error does not end the inquiry, however.  To warrant habeas relief, [the petitioner] must show that the

prosecutor's improper argument 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993))).

Here, Thompson fails to show that any alleged witness intimidation had any impact on his case. As the Superior Court found in the last reasoned opinion rejecting this claim:

> Testimony that on the night of the murder Odom sent petitioner a text message saying she would not hang out with him that night was not reasonably likely to have made any difference in the outcome of the trial. It would not have proven petitioner's intentions, nor would it have established alibi. Regardless, petitioner easily could have multiple intentions, could have used text messaging as an attempt to create alibi that did not exist, and could easily have committed the murder and sent text messages in close proximity in time to committing the murder. Indeed, Odom's testimony probably would have been of such little relevance that it likely would have been excluded under Evid. Code § 352. As such, the claim is denied.

This determination is both reasonable and fully supported by the record. Thompson thus fails to show that he was prejudiced or that the investigating officers' alleged actions had a substantial and injurious effect on the jury's verdict. Thompson's witness intimidation claim therefore fails.

*ii.      Failure to disclose exculpatory evidence (keys, arrest)*

Thompson next avers that the prosecutor withheld exculpatory evidence. The Superior Court on habeas review laid out the following background to this claim:

> Petitioner also claims that the prosecutor committed misconduct by intentionally denying exculpatory evidence that proved that the keys to the murder victim's home were taken from her possession at the scene of the crime and then used to enter her home shortly after she was murdered. He claims that it has been ignored that the victim's keys to her home were never labeled and documented as having been found at the scene. He claims that the fact that the keys were missing supports and corroborates the testimony of defense witness Diane Smart that Smart heard persons going inside the victim's home the morning after the murder, at 7 a.m. Petitioner claims that only the person who killed the victim would have had access to the victim's home, after taking the keys from the scene. He claims that this is consistent with petitioner's testimony that it was Timothy Paige ("Payday") who killed the victim.

"[T]he Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (citing *Weatherford v. Bursey*, 429 U.S. 545, 549 (1977) ("There is no general constitutional right to discovery in a criminal case."). *Brady v. Maryland*, 373 U.S. 83 (1962), and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed. *Id.* at 281. That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

In this case, Thompson fails to establish a *Brady* violation. The Superior Court subsequently denied this claim on habeas review as follows:

> It would appear that the claim is merely an attempt to reargue the evidence. A court on habeas corpus, however, does not reweigh the evidence. Rather, petitioner would need to show some new evidence, such as by attaching reasonably available documentary evidence to show that the victim had her keys in her purse immediately before or at the time of the murder. Regardless, as the purse was found near the victim, any passerby after the murder could have gone through the victim's purse and obtained the key, and could have read the victim's driver's license left in the purse and learned the victim's address. Further, petitioner attaches trial testimony to the petition that the victim's door had been broken, giving rise to speculation that the door could be opened even without a key. As petitioner may not now simply reargue the evidence, as petitioner does not show any new evidence, and as it appears that the issue of the key was simply too speculative to have made a difference in the case, the claim is denied.

As the Superior Court reasonably concluded, the evidence at issue was simply too speculative to constitute *Brady* material. The Court agrees that Thompson's claim appears to merely attempt to reargue the evidence. But this Court, like the Superior Court, is precluded

from re-weighing the evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330;

*Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). Thompson does not appear to argue

that the evidence was legally insufficient under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

(holding that the federal constitutional standard for sufficiency of the evidence is whether, "after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." Nor could he,

in light of the evidence introduced at trial, show that no reasonable factfinder could have found

him guilty of Kitty's murder. Thompson is not entitled to relief on this claim.

### iii.    *Asking jury to ignore exculpatory evidence*

Thompson additionally contends that the prosecutor committed misconduct by asking the

jury to disregard material evidence that suggested inadequate investigation or that someone other

than Thompson committed the murder. To successfully raise a claim cognizable on habeas

review based on a prosecutor's comments at trial, a petitioner must demonstrate that the

prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction

a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974)). Under this standard, only egregious prosecutorial

misconduct can give rise to a constitutional claim. *See Duckett v. Godinez*, 67 F.3d 734, 743

(9th Cir. 1995). A prosecutor's comments in summation constitute grounds for reversal only

when the remarks caused actual prejudice. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004)

(applying harmless error test to claim of prosecutorial misconduct in summation).

Respondent urges the Court to find that this claim is procedurally defaulted on federal

habeas review. As a general rule, a federal court will not review a claim if the state court's

rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Here, the superior court denied this claim with citation to *Dixon*, which indicates that the state court found the claim to be barred because it could have been but was not raised on direct appeal. *See In re Dixon*, 264 P.2d 513, 514 (Cal. 1953) ("The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constitu[t]ing an excuse for failure to employ that remedy, the writ will not lie where the claimed error could have been, but were not, raised upon a timely appeal from a judgment of conviction."); *see also In re Seaton*, 95 P.3d 896, 901 n.4 (Cal. 2004) ("What we mean when we invoke the *Dixon* bar is that the claim is *based on the appellate record*, and thus was fully cognizable on appeal insofar as it was preserved at trial.").

While the Ninth Circuit has not explicitly found that a *Dixon* default is an independent and adequate state law ground, it has indicated that it is likely to do so with respect to the time period at issue here. *See Bennett v. Mueller*, 322 F.3d 573, 580-86 (9th Cir. 2003) (suggesting in dicta that *Dixon* rule would constitute an independent and adequate state-law ground when applied after the California Supreme Court's 1998 decision in *In re Robbins*, 959 P.2d 311 (Cal. 1998)); *see also Flores v. Roe*, 228 F. App'x 690, 691 (9th Cir. 2007) (finding claim procedurally barred based on *Dixon*); *cf. Park v. California*, 202 F.3d 1146, 1152-53 (9th Cir. 2000) (holding that *Dixon* bar was not independent state law ground prior to *Robbins*). Some courts in this district have accordingly concluded that habeas review is foreclosed when the petitioner has failed to place the adequacy of the *Dixon* rule at issue and has not shown cause and prejudice or that a miscarriage of justice would result if the claim were not heard. *See, e.g.*,

*Stribling v. Grounds*, No. 12-cv-3084, 2013 WL 5817668, at *4-5 (E.D. Cal. Oct. 29, 2013);

*Cantrell v. Evans*, No. 07-cv-1440, 2010 WL 1170063, at *13-14 (E.D. Cal. Mar. 24, 2010).

It is unnecessary, however, for this Court to decide whether a procedural bar exists here because, even assuming that such bar does not exist, Thompson is not entitled to relief in any event. As the superior court noted, Thompson "does not point to any argument that crossed the line of proper argument." Rather, the record supports that the prosecutor's statements were a fair comment on the evidence presented and thus do not constitute misconduct.

As the superior court further noted, Thompson's claim appears to again challenge the sufficiency of the evidence. The state court rejected that argument with citation to *In re Lindley*, 177 P.2d 918 (Cal. 1947), which mandates that habeas corpus is not a proper vehicle for challenging the sufficiency of the evidence. The Ninth Circuit has held that *Lindley*, when used for that proposition, is an independent and adequate state procedural bar that supports default. *See Carter v. Giurbino*, 385 F.3d 1194, 1198 (9th Cir. 2004). Moreover, as previously discussed, this Court is precluded from re-weighing the evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330; *Bruce*, 376 F.3d at 957-58. Thompson is thus not entitled to relief on this claim in any event.

    iv.    Elicitation of perjury

Finally, Thompson alleges that the prosecutor elicited perjured testimony. "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted). The essential elements of such successful claim are that

(1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001). Thus, if Thompson successfully shows that the prosecutor knowingly elicited perjured testimony material to his case, habeas relief may be warranted.

Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Thompson's contention that the prosecution knowingly introduced perjured testimony. Indeed, Thompson has failed to show by way of admissible, competent evidence that any prosecution witness perjured himself or herself at trial. He provides nothing more than his unsupported assertion. This lack of evidentiary support is fatal to his claim. *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner carries the burden of proof).

As the superior court noted on habeas review, Thompson bases this prosecutorial misconduct "only on alleged inconsistency in testimony given by the witnesses." But mere inconsistencies in the evidence do not establish the knowing use of false testimony by the prosecutor. *See United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (rejecting contention that the testimony of two prosecution witnesses regarding officer's use of a wooden, rather than metal, baton was false, even though some physical evidence supported finding that a metal baton was used, because "at most, two conflicting versions of the incident were presented to the jury"); *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (fact that witnesses told stories that conflicted in various respects did not establish that the prosecutor knew that the

testimony of any of the witnesses was false; and observing that "[l]awyers in criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily trust the jury to determine what is true, or whether reasonable doubt remains about what is true").  The assertedly-conflicting evidence on which Thompson's prosecutorial misconduct claim is predicated is insufficient to establish a *Napue* violation, and Thompson's claim must fail.

**C.**     **Ineffective Assistance of Counsel (Grounds 8, 9)**

Finally, Thompson alleges that his trial counsel rendered ineffective assistance for a variety of reasons.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that

determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Thompson must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Thompson raised his attacks on trial counsel in *pro se* state habeas petitions. The Sacramento County Superior Court issued the last reasoned opinion considering and rejecting the claims as follows:

> Petitioner also claims that trial counsel rendered him ineffective assistance of counsel when counsel failed to present the jury a "confession letter" purportedly sent to petitioner in the county jail from Timothy "Payday" Paige, whom petitioner claims is the person who murdered the victim and not himself.
> In support, petitioner attaches Exhibit J, which consists of a letter to petitioner from petitioner's appellate counsel, explaining to petitioner that appellate counsel did not plan to do anything with regard to the "confession letter" because trial counsel had informed appellate counsel that a handwriting comparison had determined that "Payday" did not write the "confession letter" and because the return address did not exist or was associated with petitioner's family. According to appellate counsel, trial counsel had informed appellate counsel that trial counsel did not believe the "confession letter" was genuine.
> Petitioner does not attach any documentary evidence that would show otherwise. As the "confession letter" clearly was not genuine, trial counsel was not ineffective in failing to introduce it at trial (see <u>Strickland v. Washington</u> (1984) 466 U.S. 668).

Indeed, trial counsel had a duty under Bus. & Prof. Code § 6068(d) not to introduce evidence that counsel knew was false.

Petitioner also claims that trial counsel was ineffective in not playing for the jury a recording of an investigating officer attempting to coerce a witness into incriminating petitioner. He admits that the witness testified to the coercion, but claims that playing a recording of it would have added credibility to the testimony.

Petitioner fails to attach a copy of the recording to the petition. Nor, in any event, does petitioner show prejudice, as it is not reasonably likely that had any such recording been played to the jury that it would have made a difference in the outcome of the trial. As such, the claim fails (Strickland).

Petitioner also claims that trial counsel was ineffective in failing to consult with petitioner in a significant manner about his defense or to give petitioner the discovery.

Petitioner, however, fails to set forth or attach reasonably available documentary evidence that trial counsel did not introduce at trial, that would have been reasonably likely to have made a difference in the outcome of the trial. As such, the claim fails. (Strickland).

Petitioner also claims that trial counsel was ineffective in failing to present an expert on patterns of abusive relationships, so as to show that this did not exist with regard to petitioner and the victim but did exist with regard to the victim and the victim's boyfriend.

Petitioner, however, fails to attach any reasonably available documentary evidence from an expert on abusive relationships that would show that petitioner did not have an abusive relationship with the victim, despite the evidence introduced about petitioner's abusive conduct toward the victim. As such, the claim fails (In re Harris (1993) 5 Cal.4th 813, 827 fn. 5; Strickland).

Petitioner also claims that trial counsel was ineffective in failing to interview a certain probation officer, who testified as a prosecution witness, before the trial. Petitioner claims this resulted in trial counsel eliciting damaging testimony from the witness at trial during cross-examination, that petitioner had called the probation officer on the officer's cell phone and not on her desk phone. Petitioner appears to be claiming that had trial counsel interviewed the witness ahead of time, trial counsel would have known not to ask the allegedly damaging questions.

It is only speculation at this point that the probation officer would have been willing to be interviewed by the defense before trial or that the probation officer would have answered the question at issue. Regardless, petitioner fails to show prejudice, as the probation officer's testimony about which of the officer's cell phones petitioner had called was of little moment, and had no realistic effect on the verdict. As there was no prejudice, the claim fails (Strickland).

Petitioner also claims that trial counsel was ineffective in not presenting Kimberly Savage as a witness at trial, to testify that she was the victim's best friend and would have told her if there was any abuse going on.

Petitioner admits that the prosecution has stated to the court that Savage was out of town due to a family medical issue, indicating that Savage might have become unavailable.

Petitioner also attaches to the petition a letter from appellate counsel, in which appellate counsel informed petitioner that the trial court had disallowed the testimony of Savage and two other witnesses who were going to testify that petitioner abused the victim.

In addition, petitioner has attached a copy of a police report describing a phone interview of Savage the day after the murder. The report stated that Savage told police that one time, Savage was at the victim's house, and saw petitioner yell at the victim, get into the victim's face, and corner the victim in a room; that petitioner would not let the victim go places; that the previous week, Savage saw a scratch on the victim's chest, and the victim told her that the victim got that when petitioner had grabbed the victim. Savage also apparently told police that the victim never told Savage that petitioner had hit the victim or abusive to the victim; however, that is belied by Savage's other statements of abuse being inflicted on the victim by petitioner.

It appears that the trial court precluded testimony from Savage on this issue. Even if that had not occurred, it is clear that trial counsel would have had discovery of Savage's statement to police and likely had made a reasonable tactical decision not to present Savage as a witness, as Savage would have testified to the abuse she had observed or been told by the victim. As such, trial counsel is not shown to have been ineffective in choosing not to call Savage as a witness at trial (Strickland).

Thompson's claims fail on federal habeas review as well. Because Thompson has failed to provide any evidence to suggest that the alleged confession letter was genuine, Thompson does not demonstrate that counsel was ineffective for failing to introduce it. He likewise fails to show that he was prejudiced by counsel's failure to introduce the recording of an investigating officer attempting to coerce a witness into incriminating petitioner because, as he admits, the witness testified to the coercion. Nor does Thompson allege sufficient facts or evidence to show that defense counsel's alleged failure to allow Thompson to participate in his defense adversely affected the outcome of trial. Moreover, in light of the fact that, as the state habeas court noted, there was evidence that Thompson had an abusive relationship with the victim, it is not reasonably likely that the presentation of an abuse expert would have altered the outcome of his case. Furthermore, Thompson fails to show that counsel was ineffective for failing to interview

the two witnesses for the reasons persuasively described above.  In sum, Thompson is not entitled to relief on any argument presented in support of his ineffective assistance claims.

## V. CONCLUSION AND ORDER

Thompson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 30, 2018.

     /s/James K. Singleton, Jr.      
     JAMES K. SINGLETON, JR.
     Senior United States District Judge
